**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:     (619) 798-2006

**Counsel for Plaintiffs**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| MICHAEL WILLIAMS, BRIAN STINSON, and JUSTIN BREWER, on behalf of themselves and all others similarly situated, | Case No: |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** |
| v. | **THE UNFAIR COMPETITION LAW, THE FALSE ADVERTISING LAW, AND THE CONSUMER LEGAL REMEDIES ACT** |
| GLOBAL PRODUCT MANAGEMENT, INC., NATIONAL PRODUCT EXPLORATION, INC., and DISH DIRECT, INC. | **Jury Trial Demanded** |
| Defendants. | |

# TABLE OF CONTENTS

I.     JURISDICTION AND VENUE ..................................................................1

II.    NATURE OF THE ACTION ...................................................................1

III.   PARTIES ...................................................................................................4

IV.   REGULATORY BACKGROUND .........................................................5

V.    THE SALE OF UNAPPROVED DRUGS HARMS THE PUBLIC. ........6

VI.   DEFENDANTS MARKET AND SELL THE EXTENZE PRODUCTS AS UNAPPROVED NEW DRUGS ...............................................................6

VII.  DEFENDANTS' ADVERTISING FOR THE EXTENZE PRODUCTS IS FALSE AND MISLEADING, RENDERING THE PRODUCTS MISBRANDED. ...14

VIII. THE EXTENZE PRODUCTS ARE UNAPPROVED NEW DRUGS. ....15

IX.   THE EXTENZE PRODUCTS CONTAIN AN UNDISCLOSED AMOUNT OF YOHIMBE BARK EXTRACT, A DANGEROUS INGREDIENT .........17

X.    EXTENZE LABELS VIOLATE 21 C.F.R. § 101.93(D). .........................20

XI.   PLAINTIFFS' PURCHASES OF THE EXTENZE PRODUCTS AND RELATED INJURY. ...23

XII.  DELAYED DISCOVERY ......................................................................24

XIII. ADDITIONAL TOLLING ALLEGATIONS............................................24

XIV. DEFENDANTS' PRACTICES WERE "UNFAIR" WITHIN THE MEANING OF THE UNFAIR COMPETITION LAW. ...25

XV.  DEFENDANTS' PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW. ...25

XVI. CLASS ACTION ALLEGATIONS ..........................................................27

CAUSES OF ACTION ....................................................................................28

FIRST CAUSE OF ACTION ...........................................................................28

SECOND CAUSE OF ACTION ......................................................................30

THIRD CAUSE OF ACTION ..........................................................................31

FOURTH CAUSE OF ACTION ......................................................................32

FIFTH CAUSE OF ACTION ...........................................................................32

PRAYER FOR RELIEF ..................................................................................33

JURY DEMAND .............................................................................................34

1         Plaintiffs Michael Williams, Brian Stinson, and Justin Brewer, on behalf of themselves, all others

2 similarly situated, and the general public, by and through their undersigned counsel, hereby sue Defendant

3 Global Product Management, Inc. ("GPM"),  and National Product Exploration, Inc. ("NPE"), and Dish

4 Direct, Inc. ("Dish Direct") (collectively "Defendants") and upon information and belief and investigation

5 of counsel, allege as follows:

6                         **I.**     **JURISDICTION AND VENUE**

7       1.       Jurisdiction is proper because Plaintiffs and Defendant GPM are citizens of California and

8 because all claims are asserted under the laws of California and relate to a product that is sold in California

9 and was purchased by Plaintiffs in California.

10       2.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiffs Michael Bruce

11 Williams, Justin Brewer, and Brian Stinson reside in this District and suffered injuries as a result of

12 Defendants' conduct in this District; many of the acts and transactions giving rise to this action occurred

13 in this District; and (1) Defendant GPM resides in this District; and Defendants GPM, NPE, and Dish

14 Direct (2) are authorized to conduct business in this District, and have intentionally availed themselves of

15 the laws and markets of this District through the distribution and sale of their products in this District; and

16 (3) are subject to personal jurisdiction in this District.

17                        **II.**     **NATURE OF THE ACTION**

18       3.       During the class period, Defendants GPM, NPE, and Dish Direct marketed, distributed,

19 and sold a suite of supplements under the Extenze Brand name, including Extenze Original ("Extenze

20 OG"), Extenze Extended Release ("Extenze ER") and Extenze with Testosterone Boost ("Extenze TB")

21 (collectively the "Extenze Products"). Defendants market the Extenze Products with deceptive efficacy

22 claims which suggest that the products can increase libido, improve sexual performance, and increase

23 testosterone levels. In so doing, Defendants have violated California's consumer fraud laws, as well as its

24 health and safety code covering food and drugs.

25

26

27

28







4.     Further, Defendants' advertising for the Extenze Products includes images suggesting that the products can improve libido and sexual performance:

2



5.     However, none of the ingredients in the Extenze Products, individually or in combination, safely and effectively increase libido or testosterone levels or improve sexual performance

6.     Defendants aggressively market the Extenze Products with deceptive efficacy claims which suggest the products have medical benefits akin to prescription aphrodisiac drugs and hormone treatments.

7.     These claims are prohibited by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. ("FDCA"), and subject any individual manufacturing or selling the Extenze Products to liability for the sale of an unapproved new drug.

8.     Defendants' representations mislead consumers into believing that the Extenze Products are legal, safe, and effective for their intended purposes.

9.     Defendants promote the Extenze Products as capable of providing benefits akin to those which prescription aphrodisiac and hormone medications would provide, when in truth, the Extenze Products cannot deliver the advertised benefits and are not safe and effective for their intended purposes.

10.     Plaintiff Michael Williams purchased and used Extenze ER and Extenze TB with the belief

1  that the products were safe and effective and sold in compliance with state and federal regulations.

2      11.    Plaintiff Brian Stinson purchased and used Extenze OG and Extenze ER with the belief that

3  the products were safe and effective and sold in compliance with state and federal regulations.

4      12.    Plaintiff Justin Brewer purchased and used Extenze OG with the belief that the product was

5  safe and effective and sold in compliance with state and federal regulations.

6      13.    Plaintiffs used the Extenze Products as directed, but the products failed to deliver the

7  advertised benefits.

8      14.    Defendants' claims relating to the purported efficacy of the Extenze Products violate the

9  laws of California and the United States. Further, Defendants' sale of the Extenze violates the laws of

10  California and the United States.

11      15.    This action is brought to remedy Defendants' unfair and unlawful conduct. On behalf of the

12  class defined herein, Plaintiffs seek an order compelling Defendants to, *inter alia*: (1) cease marketing and

13  selling the Extenze Products with deceptive efficacy claims; (2) conduct a corrective advertising

14  campaign; (3) destroy all unlawful products and labeling; (4) award Plaintiffs and the Class members

15  restitution and damages; and (5) pay costs, expenses, and attorney fees.

16                    III.    **PARTIES**

17      16.    Defendant Global Product Management, Inc. is a California corporation with its principal

18  place of business in Monrovia, CA.

19      17.    Defendant National Product Exploration, Inc. is a Florida corporation with its principal

20  place of business in Boca Raton, FL.

21      18.    Defendant Dish Direct, Inc. is a California corporation with its principal place of business

22  in Tampa, FL.

23      19.    During the class period, Defendants owned, manufactured, marketed, distributed, and sold

24  the Extenze Products. Defendants marketed the Extenze Products with deceptive claims which suggest

25  the products can provide prescription aphrodisiac and hormone drug benefits.

26      20.    Plaintiff Michael Williams is a citizen of California and a resident of San Bernardino

27  County who purchased Extenze ER and Extenze TB during the class period for personal consumption.

28

CLASS ACTION COMPLAINT
*Williams et al v. Global Product Management, Inc.*

21.     Plaintiff Brian Stinson is a citizen of California and a resident of Los Angeles County who purchased Extenze OG and Extenze ER during the class period for personal consumption.

22.     Plaintiff Justin Brewer is a citizen of California and a resident of Riverside County who purchased Extenze OG during the class period for personal consumption.

### IV.    REGULATORY BACKGROUND

23.     The

Dietary Supplement Health and Education Act (DSHEA) of 1994, which amended the Federal Food, Drug, and Cosmetic Act, transformed FDA's authority to regulate dietary supplements. Under DSHEA, **FDA is not authorized to approve dietary supplements for safety and effectiveness before they are marketed**. In fact, in many cases, firms can lawfully introduce dietary supplements to the market without even notifying FDA. Since DSHEA was enacted, the dietary supplement market has grown significantly. For example, the number of products has expanded nearly twenty times since 1994.[1]

24.     "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

25.     A "new drug" is any drug "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1).

26.     Pursuant to 21 U.S.C § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA.

27.     Further, 21 U.S.C. § 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."

28.     Pursuant to 21 U.S.C. § 352(f), drugs are required to have adequate instructions for safe use.

---

[1] U.S. Food & Drug Admin., Information for Consumers on Using Dietary Supplements (October 21, 2022), available at https://www.fda.gov/food/dietary-supplements/information-consumers-using-dietary-supplements.

CLASS ACTION COMPLAINT
*Williams et al v. Global Product Management, Inc.*

29.     Pursuant to 21 C.F.R. § 310.528,

Any product that bears labeling claims that it will arouse or increase sexual desire, or that it will improve sexual performance, is an aphrodisiac drug product . . . Any OTC drug product that is labeled, represented, or prompted for use as an aphrodisiac is regarded as a new drug within the meaning of section 201(p) of the Federal Food, Drug, and Cosmetic Act.

### V.     THE SALE OF UNAPPROVED DRUGS HARMS THE PUBLIC.

30.     "Unapproved prescription drugs pose significant risks to patients because they have not been reviewed by FDA for safety, effectiveness or quality."[2]

31.     "Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, whether they are manufactured in a way that ensures consistent drug quality or whether their label is complete and accurate." *Id.*

32.     "Unapproved drugs have resulted in patient harm, and the [FDA] works to protect patients from the risks posed by these drugs." *Id.*

33.     Unapproved drugs lack "labels and prescribing information that has" "been reviewed by FDA for accuracy and completeness."[3]

34.     Consumers using unapproved drugs run the risk of "unexpected and undocumented safety concerns due to lack of rigorous pre- and postmarket safety surveillance." *Id.*

35.     Additionally, unapproved drugs lead consumers in need of medical treatment to forego medically proven therapies.

### VI.     DEFENDANTS MARKET AND SELL THE EXTENZE PRODUCTS AS UNAPPROVED NEW DRUGS

#### A.     Extenze OG's Packaging

36.     During the class period, Defendants marketed Extenze OG with deceptive efficacy claims that suggest that the product can affect the structure or function of the human body by increasing libido and sexual performance, and cure, mitigate, or treat disease, such as impotence and sexual dysfunction.

---

[2] U.S. Food & Drug Admin., Unapproved Drugs (June 2, 2021), available at https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.

[3] U.S. Food & Drug Admin., Unapproved Drugs and Patient Harm (June 2, 2021), https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs-and-patient-harm.

37.    These claims are misleading, as none of the ingredients in Extenze OG, either individually or in combination, increases libido, improves sexual performance, or treats sexual dysfunction.

38.    These claims also render Extenze OG a "drug" within the meaning of 21 U.S.C. § 321(g) and an aphrodisiac drug within the meaning of 21 C.F.R. § 310.528.

39.    However, Defendants failed to obtain FDA approval to market and distribute Extenze OG in violation 21 U.S.C. § 355 and Health & Safety Code § 111550.

40.    Exemplars of Extenze OG's packaging are as follows:

 

41.    Specifically, Defendants claim that Extenze OG is a "male sexual enhancement" supplement that can "improve your sex life" and provide "enhanced pleasure & performance."

42.    However, Extenze OG fails to deliver the advertised benefits.

43.    These efficacy claims, in addition to being misleading, render original Extenze OG a "drug" as defined by 21 U.S.C. § 321(g) and an "aphrodisiac drug" as defined by 21 C.F.R. § 310.528.

**B.      Defendants' Web Page for Extenze OG**

44.      During the class period, Defendants advertised Extenze OG with deceptive efficacy claims that suggest that the product can affect the structure or function of the human body by increasing libido, and improving sexual performance, and cure, mitigate, or treat disease, such as impotence and sexual dysfunction. The Extenze OG label, Defendants' webpage for Extenze OG, and the Extenze OG web page on the Walgreen's website, which Defendants control, contained the following claims, which show that the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease, during the Class Period:

- "Extenze"
- "Male Sexual Enhancement"
- "Improve you sex life"
- "Enhance pleasure & performance"
- "Your daily tablet to sexual health"
- "helps enhance pleasure"
- "doctor approved"
- "a simple, non-prescription option for maximum sexual performance for men, regardless of age"
- "Both professional Football and Olympic athletes are banned from taking ExtenZe because it's such a performance enhancer."

45.      These claims suggest Extenze OG can treat sexual dysfunction and affect the structure and function of the human body by increasing libido and by improving sexual performance. However, Extenze OG fails to deliver the advertised benefits.

46.      Further, these claims render Extenze OG a "drug" within the meaning of 21 U.S.C. § 321(g)(1) and an "aphrodisiac drug" within the meaning of 21 C.F.R. § 310.528.

47.      Defendants' website, www.extenze.com includes a "Buy Now" link, which redirects to the Extenze OG webpage on the Walgreen's website. True and correct copies of screenshots of the Extenze OG web page from Defendants' website and the Extenze OG web page from the Walgreen's website, www.walgreens.com, are attached hereto as **Exhibit 1.**

48.      Defendants failed to obtain FDA approval prior to marketing, distributing, and selling

Extenze OG.

### C.    Extenze ER's Packaging

49.    During the class period, Defendants marketed Extenze ER with deceptive efficacy claims that suggest that the product can affect the structure or function of the human body by increasing libido and sexual performance, and cure, mitigate, or treat disease, such as impotence and sexual dysfunction.

50.    These claims are misleading, as none of the ingredients in Extenze ER, either individually or in combination, can increase libido, improve sexual performance, or treat sexual dysfunction.

51.    These claims also render Extenze ER a "drug" within the meaning of 21 U.S.C. § 321(g) and an "aphrodisiac drug" within the meaning of 21 C.F.R. § 310.528.

52.    However, Defendants failed to obtain FDA approval to market and distribute Extenze ER in violation 21 U.S.C. § 355 and Health & Safety Code § 111550.

53.    An example of Extenze ER's packaging is as follows:



54.     Specifically, Defendants claim that Extenze ER is a "fast acting" "maximum strength male enhancement" supplement that can "enhance pleasure and performance."

55.     However, Extenze ER fails to deliver the advertised benefits.

56.     These efficacy claims, in addition to being misleading, render original Extenze ER a "drug" as defined by 21 U.S.C. § 321(g) and an "aphrodisiac drug" as defined by 21 C.F.R. § 310.528.

**D.     Defendants' Web Page for Extenze ER**

57.     During the class period, Defendants advertised Extenze ER with deceptive efficacy claims that suggest that the product can affect the structure or function of the human body by increasing libido and sexual performance, and cure, mitigate, or treat disease, such as impotence and sexual dysfunction.

58.     The Extenze ER label, Defendants' webpage for Extenze ER, and the Extenze ER web page on the CVS website, which Defendants control, contained the following claims, which show that the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease, during the Class Period:

- "Extenze"
- "Maximum Strength Male Sexual enhancement"
- "Improve you sex life"
- "Enhanced pleasure & performance"
- "enhance pleasure"
- "non-prescription option for maximum sexual performance for men, regardless of age"
- "Both professional Football and Olympic athletes are banned from taking ExtenZe because it's such a performance enhancer."
- "If you experience an erection lasting more than four hours, call your doctor."
- "If you're looking for a fast-acting way to enhance sexual performance and pleasure, Extenze Extended Release Maximum Strength Male Enhancement is for you."
- "Made with a powerful blend of natural ingredients to increase blood flow for strong and longer erections, these extended release capsules are formulated for prolonged effectiveness."
- "Fast-acting formula for maximum strength male enhancement"
- "Extended release capsules for prolonged effectiveness"
- "Designed to enhance sexual performance and pleasure"

- "Helps increase blood flow for longer-lasting erections"

59.     These claims suggest Extenze ER can treat sexual dysfunction and affect the structure and function of the human body by increasing libido and by improving sexual performance. However, Extenze ER fails to deliver the advertised benefits.

60.     Further, these claims render Extenze ER a "drug" within the meaning of 21 U.S.C. § 321(g)(1) and an aphrodisiac drug within the meaning of 21 C.F.R. § 310.528.

61.     Defendants' website, www.extenze.com includes a "Buy Now" link, which redirects to the Extenze ER web page on the CVS website, www.cvs.com. True and correct copies of screenshots of the Extenze ER web page from Defendants' website and the Extenze ER web page from the CVS website, www.cvs.com, are attached hereto as **Exhibit 2.**

62.     Defendants failed to obtain FDA approval prior to marketing, distributing, and selling Extenze OG.

**E.     Extenze TB's Packaging**

63.     During the class period, Defendants marketed Extenze TB with deceptive efficacy claims that suggest that the product can affect the structure or function of the human body by increasing libido and testosterone levels, improve sexual performance, and cure, mitigate, or treat disease, such as impotence, sexual dysfunction, and hormonal imbalance.

64.     These claims are misleading, as none of the ingredients in Extenze TB, either individually or in combination, can increase libido or testosterone levels, improve sexual performance, or treat sexual dysfunction.

65.     These claims also render Extenze TB a "drug" within the meaning of 21 U.S.C. § 321(g) and an aphrodisiac drug within the meaning of 21 C.F.R. § 310.528.

66.     However, Defendants failed to obtain FDA approval to market and distribute Extenze TB in violation 21 U.S.C. § 355 and Health & Safety Code § 111550.

67.     An example of Extenze TB's packaging is as follows:



68.     Specifically, Defendants claim that Extenze TB is an "extra strength" "male enhancement" supplement that provides "increased testosterone."

69.     However, Extenze TB fails to deliver the advertised benefits.

70.      These efficacy claims, in addition to being misleading, render original Extenze TB a "drug" as defined by 21 U.S.C. § 321(g) and an "aphrodisiac drug" as defined by 21 C.F.R. § 310.528.

1

**F.     Defendants' Web Page for Extenze TB**

71.     Further, during the class period Defendants advertised Extenze TB with deceptive efficacy claims that suggest the product can provide prescription aphrodisiac and hormone drug benefits.

72.     The Extenze TB label, Defendants' webpage for Extenze TB, the Extenze TB web page on the CVS website, and the Amazon page for Extenze TB, all of which Defendants control, contained the following claims, which show that the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease, during the Class Period:

- "Extenze"
- "Male Sexual enhancement"
- "Improve you sex life"
- "Testosterone Boost"
- "Optimize and Enhance Pleasure , Performance, Stamina."
- "increased muscle mass"
- "a simple, non-prescription option for maximum sexual performance for men, regardless of age"
- "Both professional Football and Olympic athletes are banned from taking ExtenZe because it's such a performance enhancer."
- "If you experience an erection lasting more than four hours, call your doctor."
- "increased testosterone":
- "designed to support increased testosterone, IGF-I, and muscle mass, and to boost energy and vitality"
- "Designed to Restore and Revitalize your Manhood"
- "Optimize and Enhance Pleasure, Performance, Stamina, Focus and Motivation in the Gym or in the Bedroom"
- "Supports Increased Muscle Mass, Supports Decreased Muscle Breakdown and Boosts Energy & Vitality"
- "ExtenZe Testosterone Boost is designed to support increased testosterone levels and enhance male vitality."

73.     These claims suggest Extenze TB can treat sexual dysfunction and hormonal imbalance and affect the structure and function of the human body by increasing testosterone, libido, and muscle mass and by improving sexual performance. However, Extenze TB fails to deliver the advertised benefits.

13

74.    Further, these claims render Extenze TB a "drug" within the meaning of 21 U.S.C. § 321(g)(1) and an aphrodisiac drug within the meaning of 21 C.F.R. § 310.528.

75.    Defendants' website, www.extenze.com includes a "Buy Now" link, which redirects to the Extenze TB webpage on the CVS website. True and correct copies of screenshots of the Extenze TB web page from Defendants' website and the Extenze TB web page from the CVS website, www.cvs.com, are attached hereto as **Exhibit 3.**

76.    True and correct copies of Defendants' Amazon page for Extenze TB, which Defendants control, are attached hereto as **Exhibit 4**.

77.    Defendants failed to obtain FDA approval prior to marketing, distributing, and selling Extenze TB.

## VII.    DEFENDANTS' ADVERTISING FOR THE EXTENZE PRODUCTS IS FALSE AND MISLEADING, RENDERING THE PRODUCTS MISBRANDED.

78.    It is unlawful to manufacture or sell any drug that is misbranded. 21 U.S.C. § 331(a), (b), (c), & (g).

79.    A drug is misbranded "[i]f its labeling is false or misleading in any particular."[4] 21 U.S.C. § 352(a)(1).

80.    If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the articles to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual. 21 U.S.C.S. § 321(n).

81.    Defendants' deceptive efficacy representations regarding the Extenze Products described

---

[4] Under the FDCA, "'labeling' means all labels and other written, printed, or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). This includes websites associated with the products." *See Sandoval v. Pharmacare US, Inc.*, 730 Fed. App'x 417, 420 (9th Cir. 2018).

herein render the products misbranded pursuant to Cal. Health & Safety Code § 110100 (adopting all FDA labeling regulations as state regulations), § 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded."), § 111330 (drug label misbranded if false or misleading in any particular), and further violate Cal. Bus. & Prof. Code § 17200 (Unfair Competition Law "Fraudulent" Prong) § 17500 (False Advertising Law) and Cal. Civ. Code § 1750 (CLRA).

82.     Because the Extenze Products claim to treat conditions not amenable to self-diagnosis, directions are not and likely cannot be written such that a layperson can safely use this product to treat those conditions. The Extenze Products' labels therefore lacks "adequate directions for use," rendering the product misbranded. 21 U.S.C. § 352(f)(1); see also 21 C.F.R. § 201.5 ("'Adequate directions for use' means directions under which the layman can use a drug safely and for the purposes for which it is intended.").

83.     Plaintiffs used the Extenze Products as directed, but they failed to deliver the advertised benefits.

### VIII.  THE EXTENZE PRODUCTS ARE UNAPPROVED NEW DRUGS.

84.     "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

85.     Pursuant to 21 C.F.R. § 310.528,

Any product that bears labeling claims that it will arouse or increase sexual desire, or that it will improve sexual performance, is an aphrodisiac drug product . . . Any OTC drug product that is labeled, represented, or prompted for use as an aphrodisiac is regarded as a new drug within the meaning of section 201(p) of the Federal Food, Drug, and Cosmetic Act.

86.     Here, the Extenze Products are "drugs" and "aphrodisiac drugs" because they are advertised as products which can affect the structure or function of the body by increasing libido, improving sexual performance, increasing testosterone levels and which can cure, mitigate, treat, or prevent disease such as impotence, sexual dysfunction, and hormonal imbalance.

87.     The claims on the packaging of the Extenze Products, Defendants' website, and Defendants' marketing materials for the Extenze Products render them unapproved drugs.

88.     The FDA has determined that the following claims, which are similar to those Defendants

make regarding the Extenze Products, constitute "drug claims":

- "100% Natural Male Performance Booster" (**Exhibit 5**, FDA Warning letter to Distributor RFR, LLC);

- "In just 30 minutes or less after consumption you will feel its effect, more energy, more sexual desire and more power." (**Exhibit 5**);

- "a male enhancement supplement that improves sexual performance" (**Exhibit 6**, FDA Warning letter to Umbrella);

- "no prescription needed male enhancement supplement that improves sexual performance as well as proven natural solution for erectile dysfunction" (**Exhibit 6**);

- "Natural testosterone booster" (**Exhibit 7**, FDA Warning Letter to Unlimited Nutrition);

- "[I]ncrease estrogen and testosterone levels" (**Exhibit 8**, FDA Warning Letter to Star Health & Beauty, LLC);

- "Highly anabolic" (**Exhibit 9**, FDA Warning Letter to AndroPharm, LLC);

- "Increase Muscle Mass" (**Exhibit 9**);

89.     A "new drug" is any drug "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1). Here, the Extenze Products are "new drugs" within the meaning of the FDCA because they are not generally recognized as safe and effective for their intended uses. See Title 21 of the Code of Federal Regulations, Chapter I, Subchapter D; 21 C.F.R. § 330.1.

90.     Defendants have not received approval from the FDA to sell the Extenze Products.

91.     The sale of unapproved new drugs is illegal and dangerous. First, consumers risk purchasing and using a product that will endanger their health. Second, consumers risk purchasing a product that will not effectively treat their condition, forgoing actual treatment of that condition in lieu of an unapproved new drug which may not treat their condition. The FDA's regulatory regimen helps ensure that such products are kept away from consumers.

92.     Defendants' failure to comply with these regulations puts consumers at risk and gives them an unfair advantage over competitors that do commit the time and expense of complying with such necessary regulations.

93.     The Extenze Products do not qualify for the reduced level of regulation applicable to certain

nutritional supplement products for several reasons. The Extenze Products' labels, Defendants' website, and Defendants' marketing materials neither describe the role of any nutrient or dietary ingredient intended to affect the structure or function in humans, characterize the documented mechanism by which any nutrient or dietary ingredient acts to maintain such structure or function, nor describe general well-being from consumption of any nutrient or dietary ingredient. 21 U.S.C. § 343(r)(6)(A).

94.     California similarly prohibits the sale of unapproved new drugs. Health & Safety Code § 111550.

## IX.     THE EXTENZE PRODUCTS CONTAIN AN UNDISCLOSED AMOUNT OF YOHIMBE BARK EXTRACT, A DANGEROUS INGREDIENT.

95.     Each of the Extenze Products contains an undisclosed amount of Yohimbe bark extract, a dangerous ingredient.

96.     The yohimbe extract in these products presents several risks not presented on the label.

97.     A study of "healthy individuals" found that a "dose of yohimbine . . . produced a significant increase in anxiety symptoms (e.g., mental and physical anxiety and irritability), along with an increase in systolic and diastolic blood pressure, and hyperventilation."[5]

98.     Another study "reported that the oral administration of yohimbine (20mg) induced panic episodes in 6 of 11 patients diagnosed with agoraphobia with panic attacks and significantly increased systolic blood pressure, plasma norepinephrine, and cortisol levels." *Id.*

99.     "In addition to anxiety, yohimbine has also been associated with other adverse psychiatric effects. Yohimbine has been reported to induce addictive drug seeking behavior, objective and subjective withdrawal, and elevated craving in heroin-dependent patients." *Id.*

100.     Like early antidepressant drugs, yohimbe extracts can cause serious and, in some cases, life-threatening conditions when ingested with any of the many foods containing significant amounts of the monoamine tyramine.

101.     Both yohimbe and these first-generation antidepressants are referred to as Monoamine Oxidase Inhibitors ("MAOIs").

---

[5] F. Saverio Bersani et al., *Adverse Psychiatric Effects Associated with Herbal Weight-Loss Products*, 2015 BIOMED RESEARCH INTERNATIONAL 2015:120679.

102.    MAOIs, by inhibiting monoamine oxidase, are also responsible for the reduction in the breakdown of tyramine, an amino acid in many foods. The retarding of this process by MAOIs leads to a build-up of tyramine in the body, risking severe hypertension.

103.    The dangerous combination of MAOIs and tyramine can also result in stroke and cardiac arrhythmia.

104.    As a result, those prescribed MAOIs are warned to avoid tyramine-heavy foods.

105.    Even small amounts of yohimbe may cause a dangerous spike in blood pressure.

106.    Of significant concern is an article published in 2008, which, in a year-long surveillance study of dietary supplement-related poison control center calls, found that yohimbe products accounted for almost a fifth of all exposures to dietary supplements that led to negative symptoms, despite being a very small percentage of dietary supplement sales.[6]

107.    These symptoms include: anxiety, tremulousness, diaphoresis, hypertension, palpitations, headache, chest pain, tachycardia, shortness of breath, stroke, dizziness, agitation, and abnormally dilated pupils. Id.

108.    Further, a study of adverse drug events associated with yohimbe-containing products, which analyzed cases reported to the California Poison Control System, found that "the majority (98.7%) of reported cases involved herbal (vs prescription) yohimbe products." The study also found that the most common reason for consuming yohimbe containing products among reported cases was for "sexual enhancement."

109.    The study further noted a "substantial increase in the prevalence of [adverse drug events] associated with yohimbine herbal products." Id.

110.    In 2013, the European Food Safety Authority ("EFSA") issued its Scientific Opinion on the Evaluation of the Safety in Use of Yohimbe.[7]

111.    The EFSA Panel

reviewed the available scientific data on a possible association between the intake of yohimbe

---

[6] C. Haller et al., *Dietary Supplement Adverse Events: Report of a One-Year Poison Center Surveillance Project*, 4 J. Med. TOXICOLOGY 84 (June 2008).

[7] European Food Safety Authority, Scientific Opinion on the evaluation of the Safety in Use of Yohimbe (January 2013), available at https://efsa.onlinelibrary.wiley.com/doi/pdfdirect/10.2903/j.efsa.2013.3302.

18

bark and its preparations and potential harmful effects on health. When those data were not available, priority was given to yohimbine, as the only alkaloid for which occurrence had been shown and quantified in food supplements containing yohimbe bark. The Panel concluded that the chemical and toxicological characterization of yohimbe bark and its preparations for use in food are not adequate to conclude on their safety as ingredients of food, e.g. in food supplements. Thus the Panel could not provide advice on a daily intake of yohimbe bark and its preparations that do not give rise to concerns about harmful effects to health. An estimation of exposure to yohimbine from food supplements was performed showing that theoretical maximum daily intake may exceed the maximum approved daily dose of yohimbine from use as a medicinal product.

*Id.*

112.    Further, a 2021 case report presented "four simultaneous severe poisoning/death cases caused by yohimbine."[8]

113.    "The test samples comprised the venous blood of four middle-aged men (aged 47–65) who were suspected of poisoning; one of the men died due to ineffective rescue." *Id.*

114.    Ethanol

concentration determination and toxicological routine screening were performed using gas chromatography with flame ionization detection (GC-FID) and liquid chromatography-tandem mass spectrometry (LC–MS/MS). A specific LC–MS/MS method was developed to quantify yohimbine, which showed concentrations of 459, 249, and 301 ng/mL in three poisoned blood samples and concentrations as high as 5631 ng/mL in the deceased. Moreover, the deceased's autopsy ruled out death from trauma and previous illness, and no other common toxic components were detected in his blood. Therefore, yohimbine poisoning appears to be the most likely cause of death. As a type of alkaloid that can be employed in the treatment of clinical diseases and additives for supplements, the danger of yohimbine should be of widespread concern in society.

*Id.*

115.    "This report described four simultaneous cases of yohimbine poisoning, the dangers of which should not be underestimated. By comparing the concentrations of yohimbine in the blood of three poisoned patients, the results showed that the oral bioavailability of yohimbine is variable and possibly related to the users' health." *Id.*

---

[8] Lei Zhu, Xiao Han, Jun Zhu, Le Du, Li Liu, Wenjing Gong, *Severe acute intoxication with yohimbine: Four simultaneous poisoning cases*, FORENSIC SCIENCE INTERNATIONAL, Volume 320, 2021, 110705, ISSN 0379-0738, https://doi.org/10.1016/j.forsciint.2021.110705.

CLASS ACTION COMPLAINT
*Williams et al v. Global Product Management, Inc.*

1

## X.    EXTENZE LABELS VIOLATE 21 C.F.R. § 101.93(d).

2    116.    The back panel of the packaging of each of the Extenze Products contains a disclaimer

3    which reads, "These statements have not been evaluated by the Food and Drug Administration. This

4    product is not intended to diagnose, treat, cure, or prevent any disease."

5

6

7

8                                        

9

10

11

12

13

14

15

16

17

18

19

20                                       

21

22

23

24

25

26

27

28



117.    However, the disclaimer is improperly positioned in violation of 21 C.F.R. § 101.93(d) governing structure/function claims, which provides:

The disclaimer shall be placed adjacent to the statement with no intervening material or linked to the statement with a symbol (e.g., an asterisk) at the end of each such statement that refers to the same symbol placed adjacent to the disclaimer specified in paragraphs (c)(1) or (c)(2) of this section. On product labels and in labeling (e.g., pamphlets, catalogs), the disclaimer shall appear on each panel or page where there such is a statement. The disclaimer shall be set off in a box where it is not adjacent to the statement in question.

118.    Here, on the front of the packaging of each of the Extenze Products, Defendants make efficacy claims about the product and include asterisks next to these claims, linking it to the FDA's required disclaimer.

21



119.    21 C.F.R. § 101.93(d) requires that "the disclaimer shall appear on **each panel or page** where there such is a statement." (emphasis added)

120.    Defendants make efficacy claims on the front of the Extenze Products' packaging, also known as the principle display panel, but the disclaimer does not appear on this panel. Rather, the disclaimer only appears on the back of the Extenze Products' packaging, in the lower right corner.



121.    Thus, Defendants' placement of the disclaimer violates 21 C.F.R. § 101.93(d).

## XI.    PLAINTIFFS' PURCHASES OF THE EXTENZE PRODUCTS AND RELATED INJURY.

122.    Plaintiff Michael Williams purchased Extenze ER and Extenze TB from Walgreens and CVS locations in the Colton area in 2022 and 2023.

123.    Plaintiff Brian Stinson repeatedly purchased Extenze OG and Extenze ER from convenience stores in the West Covina area. His most recent purchase occurred in 2020.

124.    Plaintiff Justin Brewer purchased Extenze OG from a gas station and a CVS in the San Jacinto area. His most recent purchase occurred in 2022.

125.    When Plaintiffs purchased the Extenze Products, they were seeking safe and effective products which would increase libido, sexual performance, and testosterone levels, and which were sold in compliance with FDA regulations and California law.

126.    Plaintiffs purchased the Extenze Products with the natural assumption that products sold in stores and online by large companies would be sold in compliance with FDA regulations and California law.

127.    Plaintiffs suffered economic injury when they purchased the Extenze Products because the products were not safe and effective for their intended purposes and were sold in violation of federal regulations and California law.

128.    Plaintiffs would not have purchased the Extenze Products had they known that the products were not safe and effective for their intended purposes and were sold in violation of federal regulations and California law

129.    The Extenze Products were offered for sale in violation of California and federal law and had a value of $0 because they are both illegal and ineffective.

130.    Plaintiffs would consider purchasing the Extenze Products in the future if they could be assured that the products were (1) safe and effective and (2) sold in compliance with all FDA regulations and California law.

## XII.    DELAYED DISCOVERY

131.    Plaintiffs did not discover that Defendants' behavior was unfair and unlawful until May 2025, when they learned that Defendants had been selling the Extenze Products in violation of federal and California law. Until this time, Plaintiffs lacked knowledge regarding the facts of their claims against Defendants.

132.    Plaintiffs are reasonably diligent consumers who exercised reasonable diligence in his purchase, use, and consumption of the Extenze Products. Nevertheless, they would not have been able to discover Defendants' unfair and unlawful practices and lacked the means to discover them given that, like nearly all consumers, they are not experts on FDA regulations or California law pertaining to the marketing of drugs.

## XIII.    ADDITIONAL TOLLING ALLEGATIONS

133.    At all relevant times, Defendants were aware that their marketing of the Extenze Products violated FDA regulations and California law.

134.    As supplement producers and distributors, Defendants had a continuing and affirmative moral and legal obligation to refrain from marketing and selling supplements with claims which violate FDA regulations and California law.

135.    Class members had no duty and no reason to inquire as to whether the Extenze Products were marketed in violation of state and federal regulations pertaining to the marketing of drugs. California, as a matter of economic regulation, places the burden of ensuring that supplements are safe, effective, and sold in compliance with FDA regulations and California law, on their manufacturers, not the general public.

136.    Reasonable consumers, including Plaintiffs, had no reason to suspect Defendants' unfair competition and violations of federal and state law prohibiting the sale of unapproved and misbranded drugs.

137.    Defendants owed a special duty to Plaintiffs and all Class Members, akin to a fiduciary duty, which they violated by marketing the Extenze Products with claims which suggest the products can affect the structure or function of the human body or can treat, mitigate, or cure disease without obtaining FDA approval to do so. During the entire Class Period, Defendants were aware that their conduct was

oppressive and cruel, causing economic injury and discouraging consumers from seeking medically proven treatments, yet consciously continued these acts for years while knowing the extent of the harm they were causing. Equity and the public policy of California, embodied in its statutes, jointly demand, in such circumstance, that laches and tolling cannot apply in such a way to permit Defendants to continue to enjoy the fruits of their intentional, cruel, oppressive, and unlawful acts.

## XIV.    DEFENDANTS' PRACTICES WERE "UNFAIR" WITHIN THE MEANING OF THE UNFAIR COMPETITION LAW.

138.    Defendants' practices as described herein are "unfair" within the meaning of the California Unfair Competition Law because Defendants' conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the utility of this conduct to Defendants does not outweigh the gravity of the harm to Defendants' victims.

139.    In particular, while Defendants' use of fraudulent advertising and unlawful drug claims to sell an ineffective product may have had some utility to Defendants in that it allows them to realize higher profit margins than if they did not use fraudulent and unlawful advertising tactics, this utility is small and far outweighed by the gravity of the economic harm Defendants inflict upon consumers. Further, the injury to consumers from Defendants' practices is substantial, not outweighed by benefits to consumers or competition, and not an injury that consumers themselves could reasonably have avoided.

## XV.    DEFENDANTS' PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW.

140.    Defendants' practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because the marketing, sale, and distribution of the Extenze Products violates California's Sherman Food, Drug, and Cosmetic Law, including federal provisions that have been adopted by California, and California consumer protection statutes:

- Health & Safety Code § 110100 et seq., which adopts all FDA labeling regulations as state regulations;
- Health & Safety Code § 111330, "Any drug or device is misbranded if its labeling is false or misleading in any particular.";
- Health & Safety Code § 110398, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";

- Health & Safety Code § 111440, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded.";

- Health & Safety Code § 111445, "It is unlawful for any person to misbrand any drug or device.";

- Health & Safety Code § 111450, "It is unlawful for any person to receive in commerce any drug or device that is misbranded or to deliver or proffer for delivery any drug or device.";

- Health & Safety Code § 111550, prohibiting sale of new drugs unless approved under 21 U.S.C. § 355;

- Civ. Code § 1770(a), prohibiting misleading practices in relation to the sale of goods;

- Bus. & Prof. Code § 17500 et seq., prohibiting false or misleading advertising;

- Bus. & Prof. Code § 17200 et seq., prohibiting fraudulent, unfair, and unlawful business activity.

- 21 U.S.C. § 331(a), prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";

- 21 U.S.C. § 331(b), prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";

- 21 U.S.C. § 352(f)(1), requiring drugs to have adequate directions for use; and

- 21 U.S.C. § 355(a), prohibiting the sale of unapproved new drugs.

141.    The fraudulent marketing and advertising of the Extenze Products constitutes a violation of the FDCA and the Sherman Law, and, as such, violated the "unlawful" prong of the UCL.

142.    Defendants' unlawful and deceptive marketing and advertising of the Extenze Products constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

143.    Defendants' unlawful acts allowed them to sell more units of the Extenze Products than they would have otherwise, and at a higher price and higher margin.

144.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

145.    Plaintiffs also seek an order for the disgorgement and restitution of all revenue received by Defendants from the sale of the Extenze Products and have no adequate remedy at law.

CLASS ACTION COMPLAINT
*Williams et al v. Global Product Management, Inc.*

## XVI.  CLASS ACTION ALLEGATIONS

146.    Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class"), excluding Defendants' officers, directors, and employees, and the Court, its officers and their families. The Class is defined as:

> All citizens and residents of the United States who purchased the Extenze Products in the United States for their own personal or household use, and not for resale, from January 1, 2019 to the present.

147.    Questions of law and fact common to Plaintiffs and the Class include:

a.    Whether Defendants' conduct constituted a violation of the unfair prong of California's Unfair Competition Law;

b.    Whether Defendants' conduct constituted a violation of the unlawful prong of California's Unfair Competition Law;

c.    Whether Defendants' conduct constituted a violation of the fraudulent prong of California's Unfair Competition Law;

d.    Whether Defendants communicated efficacy messages through the Extenze Products' labeling, packaging, website, and marketing materials;

e.    Whether those messages were material, or likely to be material, to a reasonable consumer;

f.    Whether those messages were false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

g.    Whether Defendants fraudulently omitted material information in advertising the Extenze Products as safe and effective;

h.    Whether Defendants sold and distributed the Extenze Products to the public in misleading packaging that was likely to deceive the public;

i.    Whether the Extenze Products are unapproved new drugs;

j.    Whether Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

k.    Whether the slight utility Defendants realized as a result of their conduct outweighs the gravity of the harm the conduct caused to their victims;

l.    Whether Defendants' conduct violated public policy as declared by specific constitutional, statutory, or regulatory provisions;

m.    Whether the injury to consumers from Defendants' practices is substantial;

n.    Whether the injury to consumers from Defendants' practices is outweighed by benefits to consumers or competition;

o.   Whether Class members are entitled to restitution;

p.   Whether Class members are entitled to damages and/or punitive damages;

q.   Whether Class members are entitled to an injunction and, if so, its terms; and

r.   Whether Class members are entitled to any further relief.

148.    By purchasing the Extenze Products, all Class members were subjected to the same wrongful conduct.

149.    Plaintiffs' claims are typical of the Class's claims because all Class members were subjected to the same economic harm when they purchased the Extenze Products and suffered economic injury.

150.    Plaintiffs will fairly and adequately protect the interests of the Class, have no interests that are incompatible with the interests of the Class, and have retained counsel competent and experienced in class litigation.

151.    The Class is sufficiently numerous, as it includes thousands of individuals who purchased the Extenze Products during the Class Period.

152.    Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as $30 for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

153.    Questions of law and fact common to the Class predominate over any questions affecting only individual members.

## CAUSES OF ACTION

### First Cause of Action

### Unfair Competition Law, Unlawful Prong

**Bus. & Prof. Code §§ 17200, *et seq.***

154.    In this and every cause of action, Plaintiffs reallege and incorporate the preceding allegations as if fully set forth herein.

155.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "unlawful" business acts and practices in that Defendants' conduct violates the California False Advertising Law, the California Sherman Law, and the California Consumer Legal

Remedies Act.

156.    Defendants' conduct also violates other provisions of California law including, *inter alia*:

- Health & Safety Code § 110100 et seq., which adopts all FDA labeling regulations as state regulations;

- Health & Safety Code § 111330, "Any drug or device is misbranded if its labeling is false or misleading in any particular.";

- Health & Safety Code § 110398, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";

- Health & Safety Code § 111440, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded.";

- Health & Safety Code § 111445, "It is unlawful for any person to misbrand any drug or device.";

- Health & Safety Code § 111450, "It is unlawful for any person to receive in commerce any drug or device that is misbranded or to deliver or proffer for delivery any drug or device.";

- Health & Safety Code § 111550, prohibiting sale of new drug unless approved under 21 U.S.C. § 355;

- Civil Code § 1770(a), prohibiting misleading practices in relation to the sale of goods;

- Bus. & Prof. Code § 17500 et seq., prohibiting false or misleading advertising;

- Bus. & Prof. Code § 17200 et seq., prohibiting fraudulent, unfair, and unlawful business activity.

157.    Defendants' conduct is further "unlawful" because it violated the following portions of the Federal Food, Drug, and Cosmetic Act ("FDCA"):

- 21 U.S.C. § 331(a), prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";

- 21 U.S.C. § 331(b), prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";

- 21 U.S.C. § 352(f)(1), requiring drugs to have adequate directions for use;

- 21 U.S.C. § 355(a), prohibiting the sale of unapproved new drugs;

- 21 C.F.R. § 310.528, prohibiting the sale of unapproved aphrodisiac drugs.

158.    The challenged labeling statements and marketing made by Defendants thus constituted violations of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

159.    Defendants leveraged their deception to induce Plaintiffs and members of the Class to

purchase products that were of lesser value and quality than advertised.

160.    The fraudulent marketing of the Extenze Products described herein constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

161.    Had Plaintiffs known that the Extenze Products were entirely ineffective and offered for sale in violation of California and federal regulations, Plaintiffs would not have purchased them.

162.    Plaintiffs suffered injury in fact and lost money or property as a result of Defendants' deceptive advertising: they were denied the benefit of the bargain when they decided to purchase the Extenze Products over competing products, which are legal, less expensive, and do not make misleading or false drug claims on their packaging.

163.    Defendants' unlawful acts allowed them to sell more units of the Extenze Products than they would have otherwise, and at a higher price, and higher margin.

164.    Had Plaintiffs been aware of Defendants' false and misleading advertising tactics, they would not have purchased the Extenze Products, and had Defendants not advertised the Extenze Products in a fraudulent manner, Plaintiffs would have paid less for them.

165.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendants to commence a corrective advertising campaign; and awarding the class restitution of all monies Defendants obtained from the sale of the Extenze Products. Plaintiffs have no adequate remedy at law.

### Second Cause of Action

### Unfair Competition Law, Fraudulent Prong

### Bus. & Prof. Code §§ 17200, *et seq.*

166.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

167.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "fraudulent" business acts and practices in that Defendants' conduct has a likelihood, capacity or tendency to deceive Plaintiff, the Class, and the general public.

168.    Defendants leveraged their deception to induce Plaintiffs and members of the Class to

purchase products that were of lesser value and quality than advertised.

169.    Plaintiffs and class members suffered injury in fact and lost money or property as a result of Defendants' deceptive advertising: they were denied the benefit of the bargain when they decided to purchase the Extenze Products over competing products, which are legal, less expensive, and do not make misleading or false drug claims on their packaging and websites.

170.    Had Plaintiffs been aware of Defendants' false and misleading advertising tactics, they would not have purchased the Extenze Products, and had Defendants not advertised the Extenze Products in a fraudulent manner, Plaintiffs would have paid less for them.

171.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendants to commence a corrective advertising campaign; and awarding the class restitution of all monies Defendants obtained from the sale of the Extenze Products. Plaintiffs have no adequate remedy at law.

**Third Cause of Action**

**Unfair Competition Law, Unfair Prong**

**Bus. & Prof. Code §§ 17200, *et seq.***

172.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "unfair" business acts and practices because Defendants' conduct is:

- immoral, unethical, unscrupulous, and offends public policy;

- the gravity of Defendants' conduct outweighs any conceivable benefit of such conduct; and

- the injury to consumers caused by Defendants' conduct is substantial, not outweighed by any countervailing benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided.

173.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendants to commence a corrective advertising campaign; and awarding the class restitution of all monies Defendants obtained from the sale of the Extenze Products. Plaintiffs have no adequate remedy at law.

**Fourth Cause of Action**

**False Advertising Law**

**Cal. Bus. & Prof. Code §§ 17500, *et seq*.**

174.    In violation of Cal. Bus. & Prof. Code §§ 17500 *et seq*., the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of the Extenze Products without the knowledge that the products make misleading and unapproved claims.

175.    Defendants knew and reasonably should have known that the claims made on the Extenze Products' label, packaging, website, and Amazon page were untrue and misleading.

176.    As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

177.    Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; requiring Defendants to commence a corrective advertising campaign; awarding Plaintiffs and the class restitution of all monies from the sale of the Extenze Products in an amount of $5 million or a greater amount to be proven at trial, actual and punitive damages, and interest to Plaintiffs, incentive awards to Plaintiffs in conjunction with a class award or injunction, and for attorney fees and costs to be awarded by the Court in accordance with applicable law, including the Private Attorney General Statute.

**Fifth Cause of Action**

**Consumer Legal Remedies Act**

**Civil Code §§ 1750, *et seq*.**

178.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

179.    Defendants' policies, acts and practices were designed to, and did, result in the purchase and use of the Extenze Products for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

- Civil Code § 1770(a)(5), representing that goods have characteristics, uses, or benefits which they do not have;

CLASS ACTION COMPLAINT
*Williams et al v. Global Product Management, Inc.*

- Civil Code § 1770(a)(7), representing that goods are of a particular standard, quality, or grade if they are of another;

- Civil Code § 1770(a)(9), advertising goods with intent not to sell them as advertised; and

- Civil Code § 1770(a)(16), representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

180.    As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

181.    As a further result, Plaintiffs and the Class have suffered damages, and because the conduct was deliberate, immoral, oppressive, made with malice and contrary to public policy, they are entitled to punitive or exemplary damages.

182.    Pursuant to section 1782 *et seq.* of the CLRA, Plaintiffs notified Defendants in writing by certified mail of the particular violations of § 1770 of the Act as to the Extenze Products and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act.

183.    Defendants received Plaintiffs' written notice.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Defendants as follows:

a) An order confirming that this class action is properly maintainable as a class action as defined above, appointing Plaintiffs Michael Williams, Brian Stinson, and Justin Brewer, and their undersigned counsel to represent the Class, and requiring Defendants to bear the cost of class notice;

b) An order requiring Defendants to pay $1,000 in restitution, damages, punitive damages, and interest to each named Plaintiff;

c) An order requiring Defendants to pay $5 million or a greater amount to be proven at trial in restitution, damages, and punitive damages to Class members, and $10,000 to each named Plaintiff as an incentive award, or such greater amount the Court deems fair and reasonable;

d) An order requiring Defendants to disgorge any benefits received from Plaintiffs and the Class and Defendants' unjust enrichment realized as a result of their improper and misleading advertising, marketing, sale, and distribution of the Extenze Products;

e) An Order declaring the conduct complained of herein violates the Unfair Competition Law;

f) An order requiring Defendants to cease and desist their deceptive, unconscionable, fraudulent, and

1    unlawful practices;

2    g)   An order requiring Defendants to engage in a corrective advertising campaign;

3    h)   A temporary and permanent injunction prohibiting the conduct described in the Complaint;

4    i)   An award of prejudgment and post judgment interest;

5    j)   An award of attorney fees and costs of $500,000, or such greater amount the Court awards as fair and reasonable; and

6    k)   Such other and further relief as this Court may deem just, equitable or proper.

7    **JURY DEMAND**

8    Plaintiffs demand a jury trial.

9

10   DATED: August 29, 2025                    Respectfully Submitted,

11                                             s/ Gregory S. Weston

12                                             **THE WESTON FIRM**
                                               GREGORY S. WESTON

13                                             **Counsel for Plaintiffs**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
*Williams et al v. Global Product Management, Inc.*